[Cite as *State v. Watson*, 2011-Ohio-2882.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

| STATE OF OHIO | C.A. No.     25229 |
| Appellee | |
| v. | APPEAL FROM JUDGMENT ENTERED IN THE |
| WALLACE T. WATSON | COURT OF COMMON PLEAS COUNTY OF SUMMIT, OHIO |
| Appellant | CASE No.     CR 09 08 2534 |

DECISION AND JOURNAL ENTRY

Dated: June 15, 2011

BELFANCE, Judge.

{¶1}   Defendant-Appellant Wallace T. Watson appeals from the judgment of the Summit County Court of Common Pleas.  For the reasons set forth below, we affirm.

I.

{¶2}   On the evening of August 5, 2009, S.P. went to Uncle Ricky's Bar with her cousin Celeste Jeffery.  While they were there, Mr. Watson, S.P.'s former boyfriend and father of her two children, called her and wanted to know where she was.  The two had argued earlier in the day about whether Mr. Watson got another woman pregnant.  Mr. Watson came to the bar and S.P. and Mr. Watson argued.  After a while, the three exited the bar and Mr. Watson and S.P. began arguing again.  Mr. Watson pulled S.P. by her hair, forced her into his car, punched her, forced her head down and drove away.  The two continued arguing.  Mr. Watson drove to Summit Lake and threatened to throw S.P. into the lake.

{¶3} Meanwhile, Ms. Jeffery became worried and began following the car. She ultimately lost the car and called 911 out of concern. In addition, Ms. Jeffery phoned S.P.'s mother, Tracy Weems, to tell her what had happened. Ms. Weems also called 911. Police arrived at Ms. Weems' home and spoke with Ms. Weems and Ms. Jeffery, who arrived at Ms. Weems' home shortly after police. Despite police instructions to go to the station to give a formal statement, Ms. Jeffery proceeded to go with Ms. Weems to look for S.P. Hours later they found S.P. and Mr. Watson asleep in Mr. Watson's car at Summit Lake.

{¶4} Based upon the events of that night, Mr. Watson was indicted on one count of abduction in violation of R.C. 2905.02(A)(1), one count of abduction in violation of R.C. 2905.02(A)(2), and one count of domestic violence in violation of R.C. 2919.25(A). On the day of trial, Mr. Watson pleaded guilty to domestic violence. The remaining charges were tried to a jury. The jury found Mr. Watson guilty of both counts of abduction and Mr. Watson was sentenced to an aggregate term of two years in prison. Mr. Watson has appealed, raising five assignments of error for our review.

II.

ASSIGNMENT OF ERROR I

"Pursuant to the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, the Trial Court erred by failing to sustain Appellant's objection to the State's peremptorily removing an African American prospective Juror, thus violat[ing] the mandates of Batson v. Kentucky (1986), 476 U.S. 79."

{¶5} In Mr. Watson's first assignment of error, he contends that his constitutional rights were violated when the trial court sustained the State's peremptory challenge to strike an African-American juror, Juror 6. We disagree.

{¶6} "Although a prosecutor ordinarily is entitled to exercise permitted peremptory challenges for any reason at all, as long as that reason is related to his view concerning the

outcome of the case to be tried, the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race[.]" (Internal citations and quotations omitted.) *Batson v. Kentucky* (1986), 476 U.S. 79, 89.

{¶7} "A court adjudicates a *Batson* claim in three steps. First, the opponent of the peremptory challenge must make a prima facie case of racial discrimination." (Internal citation and quotations omitted.) *State v. Bryan*, 101 Ohio St.3d 272, 2004-Ohio-971, at ¶106. "To make a prima facie case of such purposeful discrimination, an accused must demonstrate: (a) that members of a recognized racial group were peremptorily challenged; and (b) that the facts and any other relevant circumstances raise an inference that the prosecutor used the peremptory challenges to exclude jurors on account of their race." (Internal citations and quotations omitted.) *State v. Hill* (1995), 73 Ohio St.3d 433, 444-445.

{¶8} "Second, if the trial court finds this requirement fulfilled, the proponent of the challenge must provide a racially neutral explanation for the challenge. However, the explanation need not rise to the level justifying exercise of a challenge for cause." (Internal quotations and citation omitted.) *Bryan* at ¶106. The United States Supreme Court has stated that the second step "does not demand an explanation that is persuasive, or even plausible." *Purkett v. Elem* (1995), 514 U.S. 765, 768.

{¶9} "Finally, the trial court must decide based on all the circumstances, whether the opponent has proved purposeful racial discrimination. A trial court's findings of no discriminatory intent will not be reversed on appeal unless clearly erroneous." (Internal citations omitted.) *Bryan* at ¶106. See, also, *State v. Were*, 118 Ohio St.3d 448, 2008-Ohio-2762, at ¶61; *State v. Frazier*, 115 Ohio St.3d 139, 2007-Ohio-5048, at ¶64; *State v. Herring* (2002), 94 Ohio St.3d 246, 257; *State v. Johnson* (2000), 88 Ohio St.3d 95, 116. "If the trial court determines [in

the third step] that the proffered reason is merely pretextual and that a racial motive is in fact behind the challenge, the juror may not be excluded." *Frazier* at ¶65.

{¶10} It appears that the trial court concluded Mr. Watson's trial counsel presented a prima facie case of racial discrimination, as it provided the State with an opportunity to provide a race neutral explanation for the removal. The State did so stating:

> "I think she has way too many distractions in her life, her job, she worries about her son who has the CSS issues with his disabilities that she is concerned about, and several times even when I was asking her question she raised those things that were going on in her life.
>
> "Technically, she is the one that raised her hand and talked about it. And so I'm concerned that she is not fully, 100 percent with us."

{¶11} Mr. Watson maintains that "the State's race neutral reason is a pre-text in light of the similarly situated jurors." Mr. Watson asserts that the trial court "failed to consider th[at] Juror number 15 and [Juror number] 18 were similarly situated as they also disclosed that they had other important personal issues in their li[ves] to deal with at this time in their li[ves]."

> "This argument was not presented to the trial court during the *Batson* challenge and thus the trial court had no opportunity to consider it. Nonetheless, the Supreme Court of the United States has stated that '[i]f a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson's* third step.'" *State v. Bowden*, 9th Dist. No. 24767, 2010-Ohio-758, at ¶9, quoting *Miller-El v. Dretke* (2005), 545 U.S. 231, 241.

Assuming, without deciding, that we are required to consider Mr. Watson's argument concerning Jurors 15 and 18, we are not persuaded by it. In considering Mr. Watson's trial counsel's objection the trial court stated concerning Juror 6:

> "With regard to her job, the Court did clear that up. She clearly – I'm not sure I will qualify it as a hardship – expressed some concerns about her son, has sickle cell and schizophrenic and just been released from the hospital and has a worker from CSS assigned to him

"The Court also has some concern that despite the fact that I asked about medical issues or about taking medications, she never raised her hand or said anything. Yet, during the questioning from one other counsel, she brought up the issue of being diabetic and having to take medication.

"I have no question that her mind is not on this case or wants to be on this case. I will excuse her as a legitimate peremptory challenge. I think the State has made a neutral, non-race related basis to exercise the peremptory. And I will also note for the record that there is another black juror within the first 12 in the box[.]"

While it is true that Juror 15 indicated a possible problem with jury service and that Juror 18 indicated a problem getting to court everyday, neither Juror 15 or Juror 18 was facing the same concerns as Juror 6. Further, the record substantiates the trial court's concerns; Juror 6 did not respond when the trial court asked if anyone had a physical condition or required medication at a certain time; yet, later during other questioning, Juror 6 brought up the fact that she was diabetic and needed medication. Thus, we cannot say that the trial court's decision allowing the removal of Juror 6 was clearly erroneous. Therefore, we overrule Mr. Watson's first assignment of error.

## ASSIGNMENT OR ERROR II

"The Trial Court erred as a matter of law in granting the State[] of Ohio's motion for the Court to call witnesses, as its own witnesses, pursuant to Evid. Rule 614(A)."

{¶12} Mr. Watson asserts in his second assignment of error that he was prejudiced when the trial court called three witnesses as the court's witnesses and that the trial court abused its discretion in doing so. We disagree.

{¶13} "The decision as to whether to call a witness on its own motion pursuant to Evid.R. 614(A) is within the discretion of the trial court, and will be reversed only for an abuse of such discretion." *State v. Marshall* (Dec. 26, 2001), 9th Dist. No. 01CA007773, at *2. Evid.R. 614(A) provides that "[t]he court may, on its own motion or at the suggestion of a party, call witnesses, and all parties are entitled to cross-examine witnesses thus called." The rule thus

"authorizes the court to call a witness whom a party might otherwise call, on the party's suggestion that the witness would then recant another, prior statement favorable to that party." (Internal quotations and citation omitted.) *State v. Arnold*, 189 Ohio App.3d 507, 2010-Ohio-5379, at ¶43. Nonetheless, "[a]s a practical matter courts will approach the exercise of the right to call witnesses with some degree of circumspection since merely presenting a person as the court's witness may clothe that witness with an enhanced measure of dignity and prestige. The result may be an unwarranted invasion of the adversarial system[.]" (Internal quotations and citation omitted.) *State v. Combs* (Dec. 4, 1991), 9th Dist. No. 15025, at *2. In addition, "[w]hen the court calls a witness on its own motion, a party need not satisfy the surprise and affirmative-damage requirements of Evid.R. 607(A) in order to impeach the witness." *Arnold* at ¶44. Thus, Evid.R. 614(A) is a powerful tool that should be utilized judiciously; allowing a witness to be given the status of a court's witness is not a decision a trial court should enter into lightly or without consideration.

{¶14} In the instant matter, following pretrial dialogue with the prosecution in which the State indicated that three of its witnesses, Ms. Weems, Ms. Jeffery, and S.P., indicated that they would change their testimony from the statements they provided to police, the trial court agreed to call the witnesses as the court's witnesses. The fact that almost half of the State's witnesses were called as the court's witnesses troubles this Court. The purpose of the rule is not to permit a party to transform its case into the court's case. While there is nothing in the rule prescribing a specific process for the trial court in considering a request under Evid.R. 614(A), some minimal safeguards should be employed given the ramifications of allowing a witness to be a court's witness. At a minimum, this should include a requirement that the party seeking to employ Evid.R. 614(A) submit an affidavit describing the specific facts and circumstances for invoking

the rule. Further, in the face of conflicting factual allegations, if the opposing party objects to employment of the rule the trial court should examine the prospective court's witness.

{¶15} However, even assuming, without deciding, that the trial court abused its discretion in calling the witnesses as court's witnesses, Mr. Watson has not established that the error was anything other than harmless. Crim.R. 52(A) provides that "[a]ny error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded." "The Ohio Supreme Court has repeatedly held that error in the admission of evidence is harmless if there is no reasonable possibility that the evidence may have contributed to the accused's conviction. It has further written that, in order to hold the error harmless, the court must be able to declare a belief that the error was harmless beyond a reasonable doubt." (Internal quotations and citations omitted.) *State v. Morris*, 9th Dist. No. 09CACA0022-M, 2010-Ohio-4282, at ¶34. While Mr. Watson has stated that he was prejudiced by the trial court's calling of the three witnesses as court's witnesses, he has not provided any citations to the record identifying portions of the testimony that would not have otherwise been admissible if the witnesses were not granted the status of court's witnesses or explained how that testimony contributed to his convictions. See App.R. 16(A)(7). Accordingly, we overrule Mr. Watson's second assignment of error.

### ASSIGNMENT OF ERROR III

"The State of Ohio failed to introduce sufficient evidence to sustain a conviction in violation of the Appellant's right to due process of law as guaranteed by Article I, Section 10 of the Ohio Constitution and the Fourteenth Amendment to the United States Constitution."

{¶16} Mr. Watson asserts in his third assignment of error that the State failed to prove the elements of abduction. We disagree.

{¶17} "Whether a conviction is supported by sufficient evidence is a question of law that this Court reviews de novo." *State v. Williams*, 9th Dist. No. 24731, 2009-Ohio-6955, at ¶18, citing *State v. Thompkins* (1997), 78 Ohio St.3d 380, 386. The relevant inquiry is whether the prosecution has met its burden of production by presenting sufficient evidence to sustain a conviction. *Thompkins*, 78 Ohio St.3d at 390 (Cook, J., concurring). In reviewing the evidence, we do not evaluate credibility and we make all reasonable inferences in favor of the State. *State v. Jenks* (1991), 61 Ohio St.3d 259, 273. The State's evidence is sufficient if it allows the jury to reasonably conclude that the essential elements of the crime were proven beyond a reasonable doubt. Id. We have noted that we "review the issue of sufficiency in consideration of all evidence presented by the State in its case in chief, whether such evidence was properly admitted or not." *State v Denny*, 9th Dist. No. 08CA0051, 2009-Ohio-3925, at ¶12.

{¶18} Mr. Watson was convicted of two counts of abduction in violation of R.C. 2905.02(A)(1) and (2). The statute provides that:

> "No person, without privilege to do so, shall knowingly do any of the following: (1) By force or threat, remove another from the place where the other person is found; (2) By force or threat, restrain the liberty of another person under circumstances that create a risk of physical harm to the victim or place the other person in fear[.]" R.C. 2905.02(A)(1) and (2).

{¶19} Mr. Watson does not challenge the mens rea element, but instead contends that Mr. Watson "did not without privilege to do so [by] force or by threat, remove another from the place where the other person is found; or by force or threat, restrain the liberty of another person, under circumstances which create a risk of physical harm to the victim or place the other person in fear." Mr. Watson focuses on S.P.'s and Ms. Jeffery's trial testimony, while ignoring other evidence, including the witnesses' prior statements to police, which if believed, would support Mr. Watson's convictions for abduction.

{¶20} We note that Mr. Watson has not argued on appeal that any of the statements discussed below constitute hearsay. In addition, Mr. Watson failed to object to the statements quoted below as hearsay and did not request a limiting instruction concerning the statements. This Court does not condone the improper admission of evidence; however, to the extent any of the testimony below was improperly admitted, we still consider it as substantive evidence given the absence of any limiting instruction. See, also, *Denny* at ¶12.

{¶21} While S.P.'s trial testimony indicates she went willingly with Mr. Watson, the statement she gave to police provides evidence that Mr. Watson committed abduction. S.P.'s written statement states that:

> "I was [at] Uncle Rick[']s bar and [Mr. Watson] came and took me out, pull[ed] me by my hair out [of] the bar. [] We start fig[ht]ing all in the car. [] [H]e took me to [S]ummit [L]ake [and] tr[ied] to throw me [in] the lake."

{¶22} S.P. verified during her testimony that the statement above was the written statement that she provided to police. However, she continued to maintain that she went with Mr. Watson willingly and that her written statement supported that conclusion. S.P.'s statement to police was admitted into evidence without objection. Further, Detective Hill interviewed S.P. following the incident and testified that S.P. described the events in the following manner:

> "[W]hen [Mr. Watson] arrived at the bar, they had a verbal argument. [S.P.] stated that as she was trying to leave, she went to the bathroom, and as her and her cousin were trying to leave, he was in the parking lot. They began to argue again.

> "She stated that he hit her, grabbed her by her hair, dragged her to his car and forced her into the vehicle. Once inside the vehicle, she stated he held her head down, struck her once in the face, and drove away. She stated that she didn't [know] where she was at because her head was down in between her legs while she was on the expressway, and she stated when she finally came up, and they were at an area of Vernon-Od[o]m, which is * * * Wooster Avenue, and then they arrived at Summit Lake. * * * She stated that once they got to Summit Lake, he got her out of the vehicle, she described, put her arm behind her back, walked her to the edge of the dock and threaten[ed] to throw her in the water. * * * [S]he

stated to me that night that he knew that she didn't know how to swim, and he kept threatening to throw her in[.]"

In addition, while Ms. Jeffery's trial testimony indicates that S.P. went with Mr. Watson willingly, her statements to police indicate otherwise. Officer Zarembka testified that Ms. Jeffery told him that Mr. Watson and S.P. were arguing in the bar. She stated that S.P and Mr. Watson both decided to leave and when they went outside, Mr. Watson started hitting S.P. and forced her into the car. Ms. Jeffery told Officer Zarembka that Mr. Watson thereafter locked the car doors, forced S.P.'s head down and drove away. Ms. Jeffery followed in her car and told police that Mr. Watson was driving over a hundred miles per hour. Officer Zarembka testified that when he arrived at S.P.'s mother's house after S.P. was located and returned there, S.P. "was visibly shaking somewhat[.]" Officer Zarembka noted that she had a black eye and swelling around the eye. These injuries were substantiated by photographs the State submitted as exhibits.

**{¶23}** Viewing the above evidence in a light most favorable to the State, we conclude that the State presented sufficient evidence to establish beyond a reasonable doubt that Mr. Watson forcibly removed S.P. from the parking lot and restrained S.P.'s liberty by force and/or threat under circumstances that created a risk of harm or placed S.P. in fear. See R.C. 2905.02(A)(1) and (2). Accordingly, we overrule Mr. Watson's third assignment of error.

### ASSIGNMENT OF ERROR IV

"Appellant's convictions were against the manifest weight of the evidence in violation of the Ohio and United States Constitutions."

**{¶24}** Mr. Watson argues in his fourth assignment of error that his convictions for abduction are against the manifest weight of the evidence.

**{¶25}** In reviewing a challenge to the weight of the evidence, the appellate court

"'must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Thomas*, 9th Dist. Nos. 22990, 22991, 2006-Ohio-4241, at ¶7, quoting *State v. Otten* (1986), 33 Ohio App.3d 339, 340.

**{¶26}** In reversing a conviction as being against the manifest weight of the evidence, "the appellate court sits as the 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." *Thomas* at ¶8, citing *State v. Thompkins* (1997), 78 Ohio St.3d 380, 388. Accordingly, "this Court's 'discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.'" *Thomas* at ¶8, quoting *State v. Martin* (1983), 20 Ohio App.3d 172, 175.

**{¶27}** We begin by noting that the trial testimony of S.P., Ms. Weems, and Ms. Jeffery differed dramatically from the statements they each provided to police during or shortly after the incident. As the jury was confronted with both the trial testimony and the prior statements to police, the jury was faced with determining which version of events was more credible. After a thorough and independent review of the record, we cannot say that the jury's determinations were against the manifest weight of the evidence.

**{¶28}** At trial, S.P. testified that on the evening of August 5, 2009, she was with her cousin, Ms. Jeffery. The two were drinking at a friend's house. They got hungry and went to Uncle Ricky's Bar to eat and continue drinking. While they were there, Mr. Watson called her and indicated he wanted to talk to her in person to resolve an argument from earlier in the day concerning whether Mr. Watson got another woman pregnant. Mr. Watson arrived at the bar and asked S.P. to go out to his car and talk. Both S.P. and Ms. Jeffery testified that S.P. willingly got

in the car and she and Mr. Watson began to argue. According to S.P.'s and Ms. Jeffery's trial testimony, S.P. swung at Mr. Watson first and this led to a fight. S.P. testified that Mr. Watson was just trying to push her away and was not trying to hit her. She testified that she did not feel she was being kidnapped. S.P. explained at trial that she did not tell police that she started the fight because she thought if she told police what really happened she would go to jail. Mr. Watson drove off and S.P. and Mr. Watson continued fighting until Mr. Watson arrived at Summit Lake. S.P. testified that she was worried that Mr. Watson was driving to the lake to throw her in it, but stated that he did not actually remove her from the car and he did not actually threaten to throw her in it. Thereafter, Ms. Weems and Ms. Jeffery arrived at Summit Lake and took S.P. home.

{¶29} When Mr. Watson drove off with S.P., Ms. Jeffery testified that she was worried about S.P. since the two had been fighting and Ms. Jeffery had S.P.'s cell phone and so S.P. could not call if she needed help. Thus, Ms. Jeffery testified that she followed Mr. Watson's car for a while until she lost track of the vehicle. Ms. Jeffery called 911 and also called Ms. Weems. Ms. Weems testified that she called 911 based upon Ms. Jeffery's call. In the 911 call, Ms. Weems told police that Mr. Watson snatched S.P. and beat her up. She further told the 911 operator that she was tired of Mr. Watson and that Mr. Watson "jumps on my daughter too many times, he is going to end up killing her." During her trial testimony, Ms. Weems minimized much of what she said during the 911 call, essentially saying that she overreacted, she was exhausted and worried and was just going by what she was told by Ms. Jeffery. She further denied seeing any physical fights between the two on any prior occasions. Ms. Jeffery testified that after she lost sight of Mr. Watson's vehicle she proceeded to Ms. Weems' house and they both spoke with police. Thereafter, she accompanied Ms. Weems and Ms. Weems' fiancé to

look for S.P. They found S.P. and Mr. Watson sleeping in Mr. Watson's car at Summit Lake. As they approached the vehicle, Mr. Watson fled from the car.

{¶30} Both Detective Hill and Officer Zarembka testified concerning the statements made to police. Those statements, parts of which we have previously quoted above, contradict much of S.P.'s and Ms. Jeffery's trial testimony. Both S.P. and Ms. Jeffery told police that Mr. Watson forcibly put S.P. in his car and that he then proceeded to hit her. Ms. Jeffery told police that Mr. Watson locked the car doors and sped away driving over a hundred miles per hour. Further, S.P. told police that Mr. Watson brought her to the dock once they were at Summit Lake and threatened to throw her in the lake knowing that S.P. could not swim.

{¶31} We cannot conclude that the jury was unreasonable in finding Mr. Watson guilty of two counts of abduction. "The jury was able to observe the witnesses' demeanor during extensive testimony and use these observations to weigh the credibility and resolve the conflicts in the testimony." *State v. Andrews*, 9th Dist. No. 25114, 2010-Ohio-6126, at ¶28, citing *State v. DeHass* (1967), 10 Ohio St.2d 230, paragraph one of the syllabus. It would not be unreasonable for the jury to find S.P.'s, Ms. Jeffery's, and Ms. Weems' previous statements to police to be more credible than their trial testimony. S.P. testified that she still loved Mr. Watson and believed they would get back together. Thus, the jury could have reasonably concluded that S.P.'s trial testimony was motivated by her desire to redevelop a relationship with Mr. Watson. Further the jury could have reasonably found that S.P. testified at trial the way she did out of fear of Mr. Watson; Detective Hill testified that he signed the charges as S.P. did not want to press charges. Moreover, the jury could have reasonably found the physical evidence supported the prior statements to police as opposed to the trial testimony. As we noted above, Officer Zarembka testified that when he spoke with S.P. she "was visibly shaking somewhat[.]" Officer

Zarembka also noted that she had a black eye and swelling around the eye. These injuries were substantiated by photographs the State submitted as exhibits. Further, Officer Zarembka noted that S.P. did not have defensive wounds on her hands, from which the jury could have reasonably concluded that S.P. was not the primary aggressor as her trial testimony suggested. Thus, based upon a thorough review of the record, we cannot say the jury lost its way in finding Mr. Watson guilty of two counts of abduction. Mr. Watson's fourth assignment of error is overruled.

## ASSIGNMENT OF ERROR V

"The Trial Court committed error by not instructing the jury upon the lesser included offense of Unlawful Restraint, O.R.C. 2905.03"

{¶32} In Mr. Watson's fifth assignment of error, he asserts that the trial court erred in failing to instruct the jury on a lesser included offense of abduction, namely, unlawful restraint.

"In determining whether an offense is a lesser included offense of another, a court shall consider whether one offense carries a greater penalty than the other, whether some element of the greater offense is not required to prove commission of the lesser offense, and whether the greater offense as statutorily defined cannot be committed without the lesser offense as statutorily defined also being committed." *State v. Evans*, 122 Ohio St.3d 381, 2009-Ohio-2974, at paragraph two of the syllabus, clarifying *State v. Deem* (1988), 40 Ohio St.3d 205.

"[T]he test does not require identical language to define the two offenses, but focuses upon whether the words used in the statute defining the greater offense will put the offender on notice that an indictment for that offense could also result in the prosecution of the lesser included offense." Id. at ¶22. A "court should focus on the nature and circumstances of the offenses as defined, rather than on the precise words used to define them[.]" (Internal quotations and citation omitted.) Id. at ¶24. After determining the three-part test is met, "if the evidence is such that a jury could reasonably find the defendant not guilty of the charged offense, but could

convict the defendant of the lesser included offense, then the judge should instruct the jury on the lesser included offense." (Internal quotations and citation omitted.) Id. at ¶13.

{¶33} In the instant matter, Mr. Watson was indicted on one count of abduction in violation of R.C. 2905.02(A)(1) and one count of abduction in violation of R.C. 2905.02(A)(2). Mr. Watson alleges that unlawful restraint is a lesser included offense of both types of abduction. The State does not dispute this contention, but instead contends that the trial court did not err in failing to give the instruction because the jury could not have reasonably found Mr. Watson not guilty of abduction and guilty of unlawful restraint.

{¶34} Assuming, without deciding, that we agree that unlawful restraint is a lesser included offense of both types of abduction, we agree with the State.

{¶35} R.C. 2905.02(A)(1),(2), the statute prohibiting abduction, provides that:

"No person, without privilege to do so, shall knowingly do any of the following: (1) By force or threat, remove another from the place where the other person is found; (2) By force or threat, restrain the liberty of another person under circumstances that create a risk of physical harm to the victim or place the other person in fear[.]"

R.C. 2905.03(A), the statute prohibiting unlawful restraint, provides that "[n]o person, without privilege to do so, shall knowingly restrain another of the other person's liberty."

{¶36} In the instant matter we conclude that while it was possible for the jury to find Mr. Watson not guilty of either count of abduction, the jury could not then reasonably find Mr. Watson guilty of unlawful restraint. If the jury believed that S.P. willingly went with Mr. Watson thereby warranting the conclusion that Mr. Watson did not commit abduction, then the jury could not find that Mr. Watson restrained S.P.'s liberty. Therefore, the jury could only reasonably find Mr. Watson not guilty of unlawful restraint. Mr. Watson was not entitled to a lesser included offense instruction. We overrule his fifth assignment of error.

III.

**{¶37}** In light of the foregoing, we overrule Mr. Watson's assignments of error and affirm the judgment of the Summit County Court of Common Pleas.

Judgment affirmed.

_____

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.


EVE V. BELFANCE
FOR THE COURT


WHITMORE, J.
DICKINSON, P. J.
CONCUR

APPEARANCES:

PAUL M. GRANT, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and HEAVEN R. DIMARTINO, Assistant Prosecuting Attorney, for Appellee.