[Cite as *State v. Horton*, 2013-Ohio-3902.]

| | | |
|---|---|---|
| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

| | |
|---|---|
| STATE OF OHIO | C.A. No.    26407 |
| Appellee | |
| v. | APPEAL FROM JUDGMENT ENTERED IN THE |
| DONTAY D. HORTON | COURT OF COMMON PLEAS COUNTY OF SUMMIT, OHIO |
| Appellant | CASE No.    CR 11 06 1716 (C) |

DECISION AND JOURNAL ENTRY

Dated: September 11, 2013

MOORE, Presiding Judge.

{¶1} Defendant, Dontay D. Horton, appeals from his conviction in the Summit County Court of Common Pleas. We affirm.

I.

{¶2} The following facts are not in dispute in this case. On the night of June 6, 2011, several individuals, including Mr. Horton, were socializing outside of an apartment building in which David Clark resided on Cole Avenue in Akron. During this time, Frank Conley drove a black Sports Utility Vehicle on Cole Avenue. Mr. Conley stopped his SUV on the street outside of Mr. Clark's residence so that his passenger, Shauntae Hill, could speak with Mr. Clark's cousin, Vinita Clark. Eric Duck, another of Mr. Clark's cousins, believed that Mr. Clark was angry with Mr. Conley. Based on this belief, Mr. Duck broke the back window of the SUV with a brick. After this, Mr. Conley drove away, and he dropped off Ms. Hill a short distance away at her house on Andrus Street, where she resided with her mother and Mr. Horton.

{¶3} Thereafter, Mr. Horton and Ms. Hill's uncle walked to the Andrus St. house from Cole Avenue. When they approached the home, Ms. Hill and her uncle began arguing regarding the incident with the brick. Mr. Horton entered the home, stayed briefly, and then walked back to Cole Avenue to the address where Mr. Clark lived. At Cole Avenue, he visited outside with a woman who lived across the street from Mr. Clark. Mr. Horton was carrying a hand gun.

{¶4} Approximately ten to fifteen minutes after Mr. Horton returned to Cole Avenue, Mr. Conley came back to Mr. Clark's residence on foot, accompanied by an individual named Anthony Board. Mr. Clark's sister confronted the men, and she became concerned because of her belief that at least one of the men was carrying a firearm. She relayed this belief to Mr. Clark. Mr. Clark entered his apartment building and retrieved a rifle. The events following this point are in dispute; however, all witnesses agreed that Mr. Clark fired a shot, and then shots were fired at Mr. Clark by Mr. Conley, Mr. Board, and/or Mr. Horton. Mr. Clark was fatally shot, and his cousin, Charles Wallace, suffered a bullet wound to his leg.

{¶5} The Summit County Grand Jury indicted Mr. Conley, Mr. Horton, and Mr. Board on charges stemming from this shooting, including purposeful murder, felony murder, and felonious assault. The cases were severed, and Mr. Horton's case proceeded to jury trial. At the close of trial, the defense requested the trial court to instruct the jury on reckless homicide as a lesser included offense of both purposeful murder and felony murder. The trial court granted the request without objection. The jury found Mr. Horton guilty of felony murder, reckless homicide and felonious assault, each with attendant firearm specifications, and of having weapons while under disability. The trial court merged the reckless homicide conviction with the felony murder conviction, and the State elected sentencing on the felony murder conviction. The trial court sentenced Mr. Horton to a total term of incarceration of twenty-two years to life.

Mr. Horton timely appealed from the sentencing entry, and he now presents seven assignments of error for our review. We have re-ordered and combined certain assignments of error to facilitate our discussion.

II.

**ASSIGNMENT OF ERROR I**

DENIAL OF A CHALLENGE TO THE STATE'S EXERCISE OF A P[ER]EMPTORY CHALLENGE WHICH EXCLUDED A POTENTIAL JUROR BECAUSE OF HER RACE WAS CLEARLY ERRONEOUS AND DENIED DUE PROCESS AND EQUAL PROTECTION[.]

{¶6} In his first assignment of error, Mr. Horton contends that the State's use of a peremptory challenge deprived him of his constitutional rights to due process and equal protection by denying him a fair and impartial jury venire. We disagree.

{¶7} "Although a prosecutor ordinarily is entitled to exercise permitted peremptory challenges for any reason at all, as long as that reason is related to his view concerning the outcome of the case to be tried, the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race[.]" (Internal citations and quotations omitted.) *Batson v. Kentucky*, 476 U.S. 79, 89 (1986). A defendant has a "right to be tried by a jury whose members are selected by nondiscriminatory criteria." *Powers v. Ohio*, 499 U.S. 400, 404 (1991). This Court reviews whether a party exercised its peremptory challenges in a discriminatory manner under the clearly erroneous standard. *Hernandez v. New York*, 500 U.S. 352, 364-65 (1991); *see also State v. Vinson*, 9th Dist. Summit No. 23739, 2007-Ohio-6045, ¶ 21, and *Akron v. Burns*, 9th Dist. Summit No. 21338, 2003-Ohio-3785, ¶ 15.

{¶8} Courts employ a three-part test to determine whether a peremptory challenge is based on race. *State v. Bryan*, 101 Ohio St.3d 272, 2004-Ohio-971, ¶ 106; *State v. Jones*, 9th

Dist. Summit No. 22231, 2005-Ohio-1275, ¶ 27. First, the defendant must establish a prima facie case of discriminatory use of peremptory challenges by the prosecution. *Batson* at 96-97.

{¶9} Second, after the defendant makes his prima facie case, the burden shifts to the prosecution to provide a race-neutral explanation for the peremptory challenge. *Id.* at 97. To meet its burden, "the prosecut[ion] must give a clear and reasonably specific explanation of [its] legitimate reasons for exercising the challenge[.]" (Internal citations and quotations omitted.) *Batson* at 98, fn. 20. This explanation must be "based on something other than the race of the juror." *Hernandez* at 360. However, the prosecution does not have to provide "an explanation that is persuasive, or even plausible." *Purkett v. Elem*, 514 U.S. 765, 768 (1995). "[T]he issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race-neutral." (Quotations and citation omitted.) *Id.* "Unlike challenges for cause, a peremptory challenge may be exercised for *any* racially-neutral reason." (Emphasis sic.) *State v. Moss*, 9th Dist. Summit No. 24511, 2009-Ohio-3866, ¶ 12.

{¶10} In the third step of the *Batson* analysis, the trial court must determine whether, under all the relevant circumstances, the defendant has met his burden of proving purposeful racial discrimination. *Batson* at 96-97. The trial court must consider the persuasiveness and credibility of the justification offered by the prosecution. *Hicks v. Westinghouse Materials Co.*, 78 Ohio St.3d 95, 99 (1997), citing *Purkett* at 768. It must determine whether the neutral explanation offered by the prosecution is credible or is instead a pretext for unconstitutional discrimination. *Hernandez* at 363. The trial court's finding turns largely on evaluations of credibility and is given great deference. *Batson* at 98, fn. 21.

{¶11} Here, the State peremptorily challenged an African-American juror. Defense counsel objected, and, without requiring the defense to make a prima facie case of racial discrimination, the trial court requested the State to produce a "non-race ground for excusing" the juror. The State responded that the potential juror had expressed that she had a "very close relationship with two defense attorneys that are very – I guess at least one of them is a very aggressive criminal defense lawyer that has particular views that I am aware of that, you know, concern me." The State further explained those views were "aggressive views * * * regarding evidence in cases and things of that nature and how he tries cases. And, you know, once – you know, having tried cases with him before and how he tries them, and how he talks about the guilt or innocence of individuals, if they are that close and he has, I guess, relayed that to her, I would be concerned that she is somewhat slanted in that direction." Further, the State responded that the juror had stated that she previously had served on a jury that had found a defendant not guilty. The trial court accepted these reasons as constituting legitimate grounds for exercising the peremptory challenge and excused the juror.[1]

{¶12} As part of his first assignment of error, Mr. Horton claims that he was denied due process because the trial court "summarily overruled the *Batson* challenge," without "further discussion or providing the defense" with an opportunity to be heard as to the State's purportedly race-neutral rationale for challenging the juror. However, the record here does not indicate that defense counsel requested or otherwise attempted to be heard on the issue. Nor did counsel object when the court moved forward on its *Batson* ruling. Moreover, Mr. Horton does not

---

[1] This Court has recognized that "[o]nce a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot." (Internal quotation omitted.) *See State v. Davis*, 9th Dist. Summit No. 25826, 2012-Ohio-1440, ¶ 12.

further develop his argument or provide citations to any authority which requires the trial court to specifically inquire of a defendant his position as to the State's race-neutral rationale. This fact notwithstanding, this Court has previously suggested with regard to *Batson* challenges that a defendant may be required to raise his argument at the trial court level to avoid the danger of forfeiting the argument on appeal. *State v. Bowden*, 9th Dist. Summit No. 24767, 2010-Ohio-758, ¶ 9 (noting that defendant's pretext argument was not raised in the trial court, but addressing the argument on appeal by "[a]ssuming, without deciding," that we were required to do so), and *State v. Watson* 9th Dist. Summit No. 25229, 2011-Ohio-2882. *See also State v. Zepeda-Ramires*, 9th Dist. Lorain No. 12CA010275, 2013-Ohio-1224, ¶ 7 ("A fundamental rule of appellate review is that a reviewing court will not consider as error any issue that a party was aware of but failed to bring to the trial court's attention." (Citations omitted.)). If a defendant must raise a pretext argument in the trial court in order to preserve it for purposes of appeal, it would appear that he or she must be given the opportunity to do so after the prosecutor has presented the race-neutral rationale for challenging a juror. *But see State v. Williams*, 10th Dist. Franklin No. 03AP-24, 2003-Ohio-5761, ¶ 25 ("[a]lthough defendant argues that, once the prosecution offered its rationale, defense counsel should have been permitted to rebut those reasons and show pretext; the case law does not include such a requirement"). In any event, we have determined, under the facts of this particular case, that Mr. Horton did not attempt to respond to the prosecutor's presentation or object to the court's ruling without having given him an opportunity to argue pretext. Therefore, we find Mr. Horton's limited argument on this point to lack merit.

{¶13} Next, Mr. Horton maintains that the State's justification for challenging the juror based upon her close relationship with the defense attorneys was not race-neutral because the

attorneys that the juror had referenced are African-American. Aside from the impediment to this argument that the race of the referenced lawyers appears nowhere in the record, the State's purported concern was that one of the lawyers may have communicated his "aggressive views" on evidence and trial tactics to the juror. Here, nothing in the State's response inherently indicates a discriminatory intent based upon the juror's race.

{¶14} Mr. Horton further maintains that the State's response that the potential juror had previously served on a jury that acquitted a defendant amounted to pretext because another juror also had served on a jury that acquitted a criminal defendant, and the State did not challenge the other juror. As set forth above, the record does not indicate that Mr. Horton made or attempted to make this argument at the trial court level. Therefore, "the trial court had no opportunity to consider it." *See Bowden* at ¶ 9. Nonetheless, the Supreme Court of the United States has determined that, where a prosecutor's proffered reason for peremptorily challenging an African-American juror applies to an unchallenged juror who is not African-American, this is evidence indicating purposeful discrimination relevant to the third step of the *Batson* analysis. *Id.*, quoting *Miller-El v. Dretke*, 545 U.S. 231, 241 (2005). *See also Watson* at ¶ 11.

{¶15} Assuming, without deciding, that we are required to review Mr. Horton's argument, we are not persuaded. *See Bowden* at ¶ 9. The other juror who had previously served on a jury that acquitted a defendant did not also indicate a similar close relationship with defense attorneys. Based upon the additional basis for the challenge, we cannot say that the trial court was clearly erroneous in not finding that the State's explanation was pretext for purposeful discrimination. Accordingly, Mr. Horton's first assignment of error is overruled.

## ASSIGNMENT OF ERROR III

THE CONVICTION FOR FELONY MURDER MUST BE VACATED BECAUSE THE INDICTMENT FAILED TO CHARGE ANY MENS RE[A] ELEMENT FOR THE OFFENSE CONTRARY TO CONSTITUTIONAL RIGHTS TO GRAND JURY INDICTMENT AND DUE PROCESS.

## ASSIGNMENT OF ERROR IV

CONVICTION FOR FELONY MURDER ABSENT ANY PREDICATE OFFENSE AFTER JURY VERDICTS OF NOT GUILTY OF PURPOSEFUL MURDER AND GUILTY OF RECKLESS HOMICIDE VIOLATED DUE PROCESS, EQUAL PROTECTION AND DOUBLE JE[O]P[A]RDY PROTECTIONS[.]

{¶16} In his third assignment of error, Mr. Horton argues that his felony murder conviction must be vacated because the indictment failed to charge a mens rea. In his fourth assignment of error, Mr. Horton challenges his felony murder conviction on the basis that the jury found him guilty of felony murder without finding that he acted with the requisite mens rea of "knowingly" for the predicate offense of felonious assault. We disagree.

{¶17} Mr. Horton was charged with felony murder in Count 10 of a second supplemental indictment. Count 10 read:

> And the Grand Jurors of the State of Ohio, within and for the body of the County of Summit aforesaid, on their oaths in the name and by the authority of the State of Ohio, DO FURTHER FIND AND PRESENT, that c) DONTAY D. HORTON on or about the 6th day of June, 2011, in the County of Summit and State of Ohio, aforesaid, did commit the crime of MURDER in that he did purposely cause the death of David Clark, and/or did cause the death of David Clark as a proximate result of C) DONTAY HORTON committing or attempting to commit Felonious Assault, an offense of violence that is a felony of the first or second degree, in violation of Section 2903.02(A)/(B) of the Ohio Revised Code, A SPECIAL FELONY, contrary to the form of the statute in such case made and provided and against the peace and dignity of the State of Ohio.

(Capitalization sic.) Prior to jury deliberations, the State moved to amend Count 10 to eliminate that portion that alleged that Mr. Horton purposely caused the death of Mr. Clark pursuant to R.C. 2903.02(A), as this charge was contained in Count 1 of the original indictment. The count

was amended without objection. At no time before, during or after trial, did Mr. Horton object to the indictment on the basis that the felony murder charge made pursuant to R.C. 2903.02(B) failed to set forth a mens rea.

{¶18} When a defendant fails to preserve objection to a purported defect in the indictment, he forfeits all argument but that of plain error. *State v. Horner*, 126 Ohio St.3d 466 (2010), at paragraph three of the syllabus. Moreover, in *Horner* at paragraph one of the syllabus, the Ohio Supreme Court held that "[a]n indictment that charges an offense by tracking the language of the criminal statute is not defective for failure to identify a culpable mental state when the statute itself fails to specify a mental state." Therefore, where the indictment tracks the statutory language, the failure to include a mens rea element in the indictment does not amount to plain error. *See id.*; *see also State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, ¶ 37. R.C. 2903.02(B) provides, "No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not a violation of section 2903.03 or 2903.04 of the Revised Code." The felony murder charge contained in Count Ten above tracked this language.

{¶19} Therefore, "Mr. [Horton] did not object to the indictment prior to trial, so he has forfeited all but plain error in regard to this assignment of error. Mr. [Horton]'s indictment is not defective for failure to include a mens rea for felony murder because the indictment tracked the language of Section 2903.02(B) of the Ohio Revised Code, which does not specify a mens rea." *State v. Benford*, 9th Dist. Summit No. 25298, 2011-Ohio-564 ¶ 21, citing *Horner*, at paragraph one of the syllabus. Accordingly, Mr. Horton's third assignment of error is overruled.

{¶20} Although R.C. 2903.02(B), defining felony murder, does not contain a mens rea component, "a person commits felony murder pursuant to R.C. 2903.02(B) by proximately

causing another's death while possessing the mens rea element set forth in the underlying felony offense." *State v. Fry*, 125 Ohio St.3d 163, 2010-Ohio-1017, ¶ 43. Here, the predicate offense was that of felonious assault. The mens rea required for felonious assault is that of "knowingly." R.C. 2903.11(A).

{¶21} Mr. Horton was not separately charged with felonious assault as to Mr. Clark. However, he was charged with felonious assault with respect to Mr. Duck and Mr. Wallace. When the trial court instructed the jury as to the felonious assault charge relative to Mr. Wallace, the trial court explained to the jury:

> The defendant is charged in Count 2 with the offense of felonious assault. Before you can find the defendant guilty of this offense, you must find beyond a reasonable doubt that on or about the 6th day of June, 2011, and in Summit County, Ohio, the defendant did knowingly cause serious physical harm to Charles Wallace, and/or did knowingly cause or attempt to cause physical harm to Charles Wallace by means of a deadly weapon, to wit: a firearm.

{¶22} The trial court then went on to further instruct the jury on the elements of felonious assault, during which time the court defined "knowingly," as follows: "A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result. A person has knowledge of circumstances when he is aware that such circumstances probably exist." *See* R.C. 2901.22 (providing a nearly identical definition of "knowingly").

{¶23} Later, with regard to the felony murder charge, the trial court instructed the jury:

> Before you can find the defendant guilty of murder on this count, you must find beyond a reasonable doubt that on or about the 6th day of June, 2011, and in Summit County, Ohio, the defendant caused the death of David Clark as a proximate result of committing or attempting to commit felonious assault.

> I have already explained to you the definition and elements of felonious assault. You would consider and apply those definitions and elements in determining whether the defendant caused the death of David Clark while committing or attempting to commit a felonious assault on him.

{¶24} During deliberations, the jury submitted a question to the trial court asking for clarification between the charges of murder as contained in Count 1 and felony murder as contained in Count 10. The record reflects that, after discussing the question with counsel, the trial court determined that it would be best to have the jury return to the courtroom to explain the answer with counsel present. The trial court explained that Count 1 charged Mr. Horton with purposely causing Mr. Clark's death. Count 10 charged Mr. Horton with causing the death of Mr. Clark "as a proximate result of committing or attempting to commit felonious assault." The trial court explained that confusion may have arisen based upon the following:

> [O]n page 14 of the instructions I referred you back to the previous Count 2 and Count 11 definitions of felonious assault and instructed you to read and apply the principles involved in those counts in deciding this count. Potential confusion arises because Count 2 related to the alleged felonious assault with respect to Charles Wallace. Count 11 related to the alleged felonious assault of Eric Duck. And as you review the charges in the case, you obviously did not see a separate felonious assault charge with respect to David Clark himself.
>
> So what you are being called upon to decide in evaluating the Count 10 murder charge is whether the defendant committed the offense of felonious assault with respect to David Clark, using the standards for determining felonious assault as described in Counts 2 and 11.

{¶25} Therefore, the trial court instructed the jury on the elements of felonious assault, instructed the jury to utilize these elements in considering the felony murder charge, and later the court reiterated to the jury that it was to utilize these elements in determining whether Mr. Horton committed a felonious assault that proximately caused Mr. Clark's death. One element of felonious assault defined by the court was the mens rea of "knowingly." "In the absence of evidence to the contrary, we presume that the jury followed the trial court's instructions[.]" *State v. Ha*, 9th Dist. Medina No. 07CA0089-M, 2009-Ohio-1134, ¶ 48, citing *State v. Manns*, 169 Ohio App.3d 687, 2006-Ohio-5802, ¶ 93 (2d Dist.). Accordingly, we conclude that Mr. Horton's contention that the jury failed to apply the mens rea of knowingly for the predicate offense of

felonious assault relative to the felony murder charge to lack merit. Therefore, his fourth assignment of error is overruled.

## ASSIGNMENT OF ERROR VI

[MR. HORTON] WAS DENIED DUE PROCESS BY CONVICTION FOR FELONY MURDER AS THAT VERDICT WAS NOT SUPPORTED BY SUFFICIENT EVIDENCE AND WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶26} In his sixth assignment of error, Mr. Horton argues that his conviction was not supported by sufficient evidence and was against the manifest weight of the evidence. We disagree.

Sufficiency of the Evidence

{¶27} The issue of whether a conviction is supported by sufficient evidence is a question of law, which we review de novo. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). When considering a challenge to the sufficiency of the evidence, the court must determine whether the prosecution has met its burden of production. *Id.* at 390 (Cook, J. concurring). In making this determination, an appellate court must view the evidence in the light most favorable to the prosecution:

> An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.

*State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶28} While Mr. Horton alleges in his sixth assignment of error that he has challenged his conviction both as based upon insufficient evidence and as against the weight of the evidence, Mr. Horton makes no argument that the State failed to produce sufficient evidence to

support each element of the felony murder conviction. *See Thompson* at 390 (Cook, J. concurring). Instead, he reiterates that the indictment failed to allege a mens rea for felony murder, and provides the unsupported statement that the "State could not have proven an element which it had not alleged existed." As we addressed Mr. Horton's argument pertaining to the indictment in our discussion of his third assignment of error, we will proceed to examine whether the conviction was against the manifest weight of the evidence. *See* App.R. 16(A)(7).

Manifest Weight of the Evidence

{¶29} When a defendant asserts that his or her conviction is against the manifest weight of the evidence:

> [A]n appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986). In making this determination, this Court is mindful that "[e]valuating the evidence and assessing credibility are primarily for the trier of fact." *State v. Shue*, 97 Ohio App.3d 459, 466 (9th Dist.1994), citing *Ostendorf-Morris Co. v. Slyman*, 6 Ohio App.3d 46, 47 (8th Dist.1982) and *Crull v. Maple Park Body Shop*, 36 Ohio App.3d 153, 154 (12th Dist.1987).

{¶30} Here, Mr. Horton has limited his weight of the evidence challenge to his conviction for felony murder. We will likewise limit our discussion.

{¶31} As set forth above, R.C. 2903.02(B) provides, "No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not a violation of section 2903.03 or 2903.04 of the Revised Code." The State maintained that Mr. Horton caused Mr.

Clark's death while committing or attempting to commit an act of felonious assault against him. R.C. 2903.11(A) provides, "No person shall knowingly do either of the following: (1) Cause serious physical harm to another or to another's unborn; (2) Cause or attempt to cause physical harm to another or to another's unborn by means of a deadly weapon or dangerous ordnance."

{¶32} Here, there is no dispute that Mr. Horton was present with several individuals outside of Mr. Clark's residence when Mr. Duck broke Mr. Conley's window. There is also no dispute that Mr. Horton was armed and was located across the street from Mr. Clark's residence when Mr. Conley returned with Mr. Board. Therefore, we will confine our discussion to the evidence of the events that occurred thereafter.

{¶33} As part of the State's case-in-chief, it presented the testimony of several individuals, primarily family members of Mr. Clark, who were present when Mr. Conley returned to Mr. Clark's residence. These witnesses testified that, when Mr. Conley returned to Cole Avenue, he was accompanied by another individual who they later learned to be Mr. Board. Mr. Conley repeatedly said that he wanted to fight. Mr. Clark's sister, Arolanda Clark, approached the men and began to "pat down" Mr. Conley. She then attempted to do the same to Mr. Board, but Mr. Conley stopped her. Although no gun was visible, Arolanda Clark indicated to Mr. Clark that the men had a gun. Mr. Clark and Mr. Duck then entered the apartment building and closed the door. Mr. Conley and Mr. Duck's sister, Daunae Duck, then engaged in a verbal altercation. While they argued, Mr. Conley and Mr. Board began to retreat westerly on Cole Avenue. Mr. Clark and Mr. Duck remained indoors, and individuals present outside yelled to Mr. Duck that Mr. Conley was fighting with his sister, and that he should come out of the building. Mr. Duck and Mr. Clark then emerged from the building, and Mr. Clark was carrying a large rifle. The State's witnesses indicated that Mr. Clark fired a "warning shot" or fired "in the

air." After he did so, shots were fired from the area where Mr. Conley and Mr. Board were located as well as from the north, across Cole Avenue, where Mr. Horton was located.

{¶34} In addition, Shequita Clark, Mr. Clark's cousin, testified that she was present outside of Mr. Clark's residence at the time of the shooting. She testified that, after Mr. Clark fired a shot in the air, Mr. Conley and Mr. Board began shooting toward them. Mr. Horton then approached Mr. Clark from behind and shot him in his back. Moreover, London Campbell testified that she was visiting Shequita Clark at Mr. Clark's residence on the night at issue. Ms. Campbell testified that by the time that Mr. Clark had shot the gun in the air, Mr. Horton, who had been sitting on the stoop across the street, ran across the street. Mr. Horton then came up behind Mr. Clark and shot him.

{¶35} George Sterbenz, MD, the Chief Medical Examiner at the Summit County Medical Examiner's Office, testified as to the nature of the gunshot wounds sustained by Mr. Clark. Mr. Clark was shot three times: once in each leg, and once in his torso. Dr. Sterbenz indicated that the fatal wound was the shot to his torso, because the bullet passed from his right armpit area through the left side of his body, causing severe injuries to his heart and lungs. Neither the bullet nor any fragments were present relative to the shot through the torso. Because no gunshot residue was located on Mr. Clark or on his clothes, Dr. Sterbenz classified all three shots as "long-range," meaning that they likely came from at least ten to eighteen inches away from Mr. Clark's body.

{¶36} Andrew Chappell, a forensic scientist at the Ohio Bureau of Criminal Identification and Investigation ("BCI"), tested bullet casings recovered from the scene. Mr. Chappell testified that two casings were matched to a gun that police had retrieved from Mr. Board's home. These casings were located in the area where witnesses placed Mr. Conley and

Mr. Board at the time of the shooting. Three other casings were found in the area across the street from Mr. Clark's residence. These casings indicated that they were fired from the same gun; however, this gun was not submitted to BCI for testing.

{¶37} As part of the defense's case, Mr. Horton testified on his own behalf. Mr. Horton acknowledged that he was carrying a firearm on the date at issue for protection. After he returned to Cole Avenue from the Andrus home, he visited outside with a woman who lived across the street from Mr. Clark. Ten to fifteen minutes after Mr. Horton arrived back at Cole Avenue, he saw Mr. Conley and Mr. Board approach Mr. Clark's residence on foot, and Mr. Conley was declaring that he wanted to fight. Mr. Clark's sister indicated that Mr. Conley and Mr. Board had a gun, although no gun was visible. Mr. Clark then went into his apartment building. Mr. Conley and Mr. Board began retreating down Cole Avenue, and Mr. Horton lost sight of them. Mr. Clark emerged from the apartment building with a rifle and shot in the direction of where Mr. Conley and Mr. Board had headed. Concerned for the safety of Mr. Conley, who was a close friend of Mr. Horton, Mr. Horton fired three shots in Mr. Clark's direction from across the street. He then ran down Marcy Street, which intersects with Cole Avenue, and he saw Mr. Duck also running down Marcy Street. Mr. Horton fired several shots in the air, as a warning to Mr. Duck in case he was carrying a gun. Mr. Horton then threw is gun into a nearby field.

{¶38} Therefore, Mr. Horton conceded that he fired shots in Mr. Clark's direction on the night at issue. At trial, he maintained that he did so in defense of Mr. Conley. However, he has not advanced an argument on appeal as to the weight of evidence pertaining to defense of others. Instead, he maintains that the weight of the evidence did not support his conviction because no forensic evidence established that the fatal shot suffered by Mr. Clark was fired by Mr. Horton.

Although "the lack of physical evidence is a factor for the jury to weigh," Dr. Sterbenz indicated that the wound to Mr. Clark's torso was caused by a bullet travelling from his right armpit, through his chest cavity, lungs, and heart, and out his left side. *See State v. Martin*, 9th Dist. Summit No. 26221, 2013-Ohio-87, ¶ 34. Mr. Horton's own testimony established that he was located to the north of Mr. Clark, and Mr. Horton maintained that Mr. Clark fired a shot to the west. Therefore, based upon the respective locations of the individuals involved, the jury could reasonably infer that Mr. Horton fired the shot that proximately caused Mr. Clark's death.

**{¶39}** Further, the trial court instructed the jury on complicity. Ohio's complicity statute provides:

> (A) No person acting with the kind of culpability required for the commission of an offense, shall do any of the following:
>
> (1) Solicit or procure another to commit the offense;
>
> (2) Aid or abet another in committing the offense;
>
> (3) Conspire with another to commit the offense in violation of section 2923.01 of the Revised Code;
>
> (4) Cause an innocent or irresponsible person to commit the offense.

R.C. 2923.03(A). In order to support a conviction based upon a defendant's complicity through "aiding and abetting:"

> [T]he evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal. Such intent may be inferred from the circumstances surrounding the crime.

*State v. Johnson*, 93 Ohio St.3d 240, 245 (2001).

**{¶40}** Therefore, to be complicit through aiding and abetting, the accused must have taken some role in causing the commission of the offense. "[T]he mere presence of an accused at the scene of the crime is not sufficient to prove, in and of itself, that the accused was an aider

and abettor." *State v. Widner*, 69 Ohio St.2d 267, 269 (1982). The testimony adduced at trial indicates that Mr. Horton, along with Mr. Conley and/or Mr. Board, fired at Mr. Clark. The jury could have concluded from the evidence that Mr. Horton assisted Mr. Conley and/or Mr. Board in the shooting of Mr. Clark, and that, in doing so, he shared the purpose of committing a felonious assault against him. Accordingly, the jury could have appropriately concluded that Mr. Horton was responsible for Mr. Clark's death based upon a theory of complicity despite whether the fatal shot was fired by him, Mr. Conley, or Mr. Board.

**{¶41}** Based upon our review of the record, including the evidence set forth above, we cannot say that the jury lost its way in convicting Mr. Horton of felony murder predicated upon felonious assault. Accordingly, we conclude that this is not the exceptional case where the jury created a manifest miscarriage of justice in finding Mr. Horton guilty of felony murder.

**{¶42}** Therefore, Mr. Horton's sixth assignment of error is overruled.

## ASSIGNMENT OF ERROR II

THE TRIAL COURT DENIED DUE PROCESS BY COMPELLING THE ACCUSED TO TESTIFY IN ORDER TO OBTAIN A REQUESTED INSTRUCTION OF DEFENSE OF ANOTHER.

**{¶43}** In his second assignment of error, Mr. Horton argues that he was denied due process because the trial court compelled him to testify in order for him to receive a jury instruction on self-defense and defense of another. We disagree.

**{¶44}** After the State rested its case-in-chief and the trial court admitted the State's exhibits, the following exchange occurred,

[DEFENSE COUNSEL]: * * * Are we – are you going to rule on the jury instructions before I put my case on? It may have some bearing on whether—

THE COURT: I wasn't intending to.

If you think about the burden of proof issue, the defense bears the burden of proof with respect to any affirmative defense. You have offered the affirmative defense of either self-defense or defense of others.

[PROSECUTOR]: Well, Judge, can I just add that I don't think you can do the jury instructions until he testifies, because there are certain things he may not get that he may be asking for but for evidence that he puts on. Like, you know, if he wants to try to do a reckless or something along those lines, he might have to testify.

THE COURT: I wasn't intending to finalize the jury instructions until the evidence is all in.

At this stage, I have been advised informally by counsel that the State is going to seek the standard instructions for murder on two theories, and felonious assault, and weapon under disability, and the gun specification, standard instructions. The State has also advised that it will seek a consciousness of guilt instruction.

**{¶45}** At this point, the bailiff advised the trial court judge that they had been asked to evacuate the building due to a fire alarm. After the proceedings came back on the record, the trial court explained:

While we were off the record, we had discussion among the Court and counsel concerning the status of the jury instructions. And counsel for the defense inquired whether the Court would give an instruction on self-defense and/or defense of another.

The Court has given consideration to the Ohio Jury Instructions 421.21 and 421.23. * * *

If you look at 421.23, you see: In deciding whether the defendant had reasonable grounds to believe and an honest belief that Frank Conley was in imminent or immediate danger of death, you must put yourself in a position of the defendant with his or her characteristics, his or her knowledge or lack of knowledge, and under the circumstances and conditions that surrounded him at the time. You, meaning the jury, must consider the conduct of David Clark and decide whether his acts and words caused the defendant reasonably and honestly to believe that Frank Conley was about to be killed.

Now, given the wording of those pattern jury instructions, * * * I do not believe it would be possible for the defense to have admitted sufficient evidence to support the giving of those charges, unless the jury had the ability to judge the position, the characteristics, and the knowledge or lack of knowledge of the defendant.

So if your inquiry was to the Court – to the Court was whether the Court would give such an instruction given the current state of the evidence, if the defendant were not to testify, I believe the answer would be no. I don't believe I would have a basis for giving that instruction given the facts that are currently in the record. Because we don't have any evidence from any source regarding the knowledge of the defendant.

\* \* \*

**{¶46}** Mr. Horton did testify, and the trial court provided an instruction on defense of others. On appeal, Mr. Horton has framed his argument to maintain that he was forced to be a witness against himself in violation of U.S. Const. Amend. V and XIV, and Ohio Const. Art. 1, Section 10. However, at no point did the trial court require Mr. Horton to testify. Instead, it determined at the close of the State's case-in-chief that, "given the current state of the evidence," no evidence existed as to Mr. Horton's knowledge that supported the theory that Mr. Horton acted in self-defense or defense of Mr. Conley.

**{¶47}** "A criminal defendant has a right to expect that the trial court will give complete jury instructions on all issues raised by the evidence." *State v. Williford*, 49 Ohio St.3d 247, 251 (1990). In regard to the issue of self-defense "the defendant must show (1) that he was not at fault in creating the situation giving rise to the affray; (2) that he had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was in the use of force; and (3) that he did not violate any duty to retreat or avoid the danger." *State v. Campbell*, 9th Dist. Lorain No. 97CA006973, 1999 WL 492595, \*5 (July 14, 1999), citing *Williford* at 249. In regard to the issue of defense of others, the intervenor "stands in the shoes of the person whom he is aiding, and if the person aided is the one at fault, then the intervenor is not justified in his use of force and is guilty of an assault." *Campbell* at \*5, quoting *State v. Wenger*, 58 Ohio St.2d 336, 340 (1979).

{¶48} Mr. Horton argues that evidence did exist at the close of the State's case from which his knowledge supporting theories self-defense or defense of others could be inferred. In support, he points to Ms. Hill's testimony. Ms. Hill testified that, after the gunfire, Mr. Horton returned to the Andrus home in an agitated state. He sat on the couch repeating, "[s]hit tweaky, man," which Ms. Hill explained as meaning that "crazy" events just took place. Mr. Horton maintains that this provides evidence from which the jury could have inferred that Mr. Horton acted in self-defense or defense of another. We fail to discern how the jury could infer from this any evidence "which, if believed, would raise a question in the minds of reasonable men concerning the existence of" self-defense or defense of another. *State v. Melchior*, 56 Ohio St.2d 15 (1978), paragraph one of the syllabus. Based only upon the evidence presented during the State's case-in-chief, we agree with the trial court that an instruction on self-defense or defense of others would have been inappropriate. Therefore, Mr. Horton's argument that the trial court's incorrect assessment of the evidence in effect compelled him to testify lacks merit. Further, we note that, in any event, Mr. Horton was not limited to his own testimony in asserting these defenses. Instead, he could have raised these defenses from other sources or on cross-examination by eliciting testimony from which a reasonable jury could reach the conclusion that he acted in self-defense or defense of others. The defense chose to pursue these defenses through Mr. Horton's testimony. Accordingly, Mr. Horton's second assignment of error is overruled.

## ASSIGNMENT OF ERROR V

THE JURY INSTRUCTIONS WERE MISLEADING TO THE PRE[J]UDICE OF [MR. HORTON]'S SUBSTANTIAL RIGHTS DUE TO PLAIN ERRORS OF FAILING TO INCLUDE CHARGES OF INVOLUNTARY MANSLAUGHTER AND AGGRAVATED ASSAULT[.]

**{¶49}** In his fifth assignment of error, Mr. Horton argues that the trial court committed plain error in failing to instruct the jury on the lesser included offenses of aggravated assault and involuntary manslaughter. We disagree.

**{¶50}** "A criminal defendant has the right to expect that the trial court will give complete jury instructions on all issues raised by the evidence." *State v. Williford*, 49 Ohio St.3d 247, 251 (1990). "This Court reviews a trial court's decision to give or not give jury instructions for an abuse of discretion under the particular facts and circumstances of the case." *State v. Calise*, 9th Dist. Summit No. 26027, 2012-Ohio-4797, ¶ 68, citing *State v. Sanders*, 9th Dist. Summit No. 24654, 2009-Ohio-5537, ¶ 45. However, here, Mr. Horton did not request the jury instructions that he now argues were erroneously omitted. Therefore, he has forfeited all but plain error analysis on review. *Williford* at 251; Crim.R. 30(A); *State v. Gray*, 9th Dist. Wayne No. 08CA0057, 2009-Ohio-3165, ¶ 7. Pursuant to Crim.R. 52(B), a plain error or defect that affects a substantial right may be noticed although it was not brought to the attention of the trial court. "A plain error must be obvious on the record, such that it should have been apparent to the trial court without objection." *State v. Kobelka*, 9th Dist. Lorain No. 01CA007808, 2001 WL 1379440, *2 (Nov. 7, 2001). As notice of plain error is to be taken with utmost caution and only to prevent a manifest miscarriage of justice, the decision of a trial court will not be reversed due to plain error unless the defendant has established that the outcome of the trial clearly would have been different but for the alleged error. *Kobelka* at *2, citing *State v. Waddell*, 75 Ohio St.3d 163, 166 (1996), and *State v. Phillips*, 74 Ohio St.3d 72, 83 (1995).

**{¶51}** Here, Mr. Horton argues that the trial court committed plain error by failing to instruct the jury on aggravated assault and involuntary manslaughter. Aggravated assault is defined in R.C. 2903.12, which provides, in part:

(A) No person, while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force, shall knowingly:

(1) Cause serious physical harm to another or another's unborn;

(2) Cause or attempt to cause physical harm to another or to another's unborn by means of a deadly weapon or dangerous ordnance, as defined in section 2923.11 of the Revised Code.

{¶52} "It is well settled that aggravated assault is an inferior degree offense of felonious assault." *State v. Bostick*, 9th Dist. Summit No. 25853, 2012-Ohio-5048, ¶ 6. Thus, "in a trial for felonious assault, where the defendant presents sufficient evidence of serious provocation, an instruction on aggravated assault must be given to the jury." (Internal citations and quotations omitted.) *Id.* "Provocation, to be serious, must be reasonably sufficient to bring on extreme stress and the provocation must be reasonably sufficient to incite or to arouse the defendant into using deadly force." *State v. Deem*, 40 Ohio St.3d 205, 211 (1988). The analysis of whether the provocation was reasonably sufficient to prompt sudden passion or fit of rage contains two prongs: an objective prong and a subjective prong. *State v. Shane*, 63 Ohio St.3d 630, 634 (1992). As to the objective prong, the provocation must be "sufficient to arouse the passions of an ordinary person beyond the power of his or her control." *Id.* As to the subjective, the inquiry relates to "whether the defendant in the particular case 'actually was under the influence of sudden passion or in a sudden fit of rage[.]'" *State v. Mack*, 82 Ohio St.3d 198, 201 (1998), quoting *Shane* at 634-635.

{¶53} Here, we conclude that the evidence did not indicate that Mr. Horton was subjectively under the influence of sudden passion or in a sudden fit of rage to incite the use of deadly force. Instead, Mr. Horton testified that he intentionally fired shots in Mr. Clark's

direction because he feared for the safety of Mr. Conley. *See State v. Conway*, 108 Ohio St.3d 214, 2006-Ohio-791, ¶ 135.

**{¶54}** "Thus, even if the events leading up to the shootings could be viewed as sufficiently provocative under an objective standard in the instant case, there is no evidence that [Mr. Horton] subjectively acted under the influence of sudden passion or fit of rage brought on by serious provocation occasioned by the victim that was reasonably sufficient to incite defendant into using deadly force." *State v. Booker*, 6th Dist. Lucas No. L-10-1140, 2013-Ohio-45, ¶ 28. To the contrary, Mr. Horton maintained that he purposely shot toward Mr. Clark in order to protect Mr. Conley. Mr. Horton requested and obtained an instruction on defense of others. Mr. Horton incorrectly contends that the same evidence supporting his claim of defense of others supported the instruction on aggravated assault. Mr. Horton's testimony indicated that he acted based upon fear. "Fear alone is insufficient to demonstrate the kind of emotional state necessary to constitute sudden passion or fit of rage." *Mack* at 201. Nothing in Mr. Horton's testimony indicated that he acted in "sudden passion or in a sudden fit of rage." *See e.g. State v. Cremeans,* 9th Dist. Summit No. 22009, 2005-Ohio-261, ¶ 16 (concluding that the mental states of fear as required for self-defense and rage as required for aggravated assault are incompatible); *State v. Harris*, 129 Ohio App.3d 527, 535 (10th Dist.1998) (describing a "fit of rage" as "akin to anger, hatred, jealousy, and/or furious resentment").

**{¶55}** Accordingly, we conclude that the trial court did not commit plain error by omitting the instruction of aggravated assault as an inferior degree offense of felonious assault.

**{¶56}** Mr. Horton further argues that the trial court committed plain error by failing to instruct the jury on involuntary manslaughter as a lesser offense of felony murder. R.C. 2903.04 defines the offense of involuntary manslaughter, and provides that "[n]o person shall cause the

death of another * * * as a proximate result of the offender's committing or attempting to commit a felony." Whereas felony murder requires a predicate offense of a first or second degree felony, involuntary manslaughter requires a predicate offense of any degree felony. Mr. Horton has argued that aggravated assault could have served as a lesser degree felony on which involuntary manslaughter could have been predicated. *See* R.C. 2903.12(B) (aggravated assault is a felony of the fourth degree unless the victim is a peace officer). However, as we rejected Mr. Horton's argument above that the trial court committed plain error in failing to give an instruction on aggravated assault, we likewise reject Mr. Horton's argument that the trial court committed plain error in failing to provide an instruction on involuntary manslaughter predicated on aggravated assault.

{¶57} Accordingly, Mr. Horton's fifth assignment of error is overruled.

## ASSIGNMENT OF ERROR VII

THE CUMULATIVE EFFECT OF TRIAL COURT ERRORS DENIED DUE PROCESS AND FAIR TRIAL.

{¶58} In his seventh assignment of error, Mr. Horton argues that the cumulative effect of the trial court's errors violated his due process rights.

{¶59} Cumulative error exists only where the errors during trial actually "deprive[d] a defendant of the constitutional right to a fair trial." *State v. DeMarco*, 31 Ohio St.3d 191 (1987), paragraph two of the syllabus. "[T]here can be no such thing as an error-free, perfect trial, and * * * the Constitution does not guarantee such a trial." *State v. Hill*, 75 Ohio St.3d 195, 212 (1996), quoting *U.S. v. Hasting*, 461 U.S. 499, 508-09 (1983). To support a claim of cumulative error, there must be multiple instances of harmless error. *State v. Garner*, 74 Ohio St.3d 49, 64 (1995).

**{¶60}** Mr. Horton argues that, were we to conclude that the trial court erred as he has argued in his assignments of error above, and were we to conclude such errors were not prejudicial, then the cumulative error doctrine applies. However, as we have not found multiple instances of harmless error above, Mr. Horton's seventh assignment of error is overruled. *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, ¶ 132 (unless there exists multiple errors, the cumulative error doctrine does not apply).

III.

**{¶61}** Mr. Horton's assignments of error are overruled. The judgment of the Summit County Court of Common Pleas is affirmed.

Judgment affirmed.

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

CARLA MOORE
FOR THE COURT

CARR, J.
WHITMORE, J.
CONCUR.

APPEARANCES:

MARK H. LUDWIG, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and HEAVEN DIMARTINO, Assistant Prosecuting Attorney, for Appellee.